NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2024 VT 85

No. 24-AP-132

| | |
|---|---|
| Paul Westcott | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windsor Unit, |
| | Civil Division |
| | |
| Mack Molding Co., Inc. | October Term, 2024 |

H. Dickson Corbett, J.

David Bond of Law Office of David Bond, PLLC, Burlington, and Marc D. Nemeth of Law
  Office of Marc D. Nemeth, White River Junction, for Plaintiff-Appellant.

Timothy E. Copeland, Jr., F. David Harlow, and Krista A. Gay of Downs Rachlin Martin, PLLC,
  Brattleboro, for Defendant-Appellee.

PRESENT:  Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.

¶ 1.  **WAPLES, J.**  Employee Paul Westcott surreptitiously recorded conversations at work and employer Mack Molding Co., Inc. fired him for lying about it.  Employee sued employer.  The trial court concluded at summary judgment that employee's recording activities were not protected by Vermont's Fair Employment Practices Act (FEPA) or Worker's Compensation Act (WCA).  The trial court further concluded that employee could not sustain his breach-of-contract or promissory-estoppel claims.  We affirm.

¶ 2.  The record below reveals the following material facts.  Employee worked for employer for over thirty years.  Two of employee's good friends, Angela and Donald Gates, worked alongside him for employer.  When Ms. Gates suffered what she believed to be a work-related injury in 2016, employee wrote a letter of support on her behalf to management (the 2016

letter). Ms. Gates eventually took a leave of absence from work and her employment was later terminated. She sued employer in late 2017, alleging employment discrimination. See Gates v. Mack Molding Co., 2022 VT 24, ¶¶ 2-11, 216 Vt. 379, 279 A.3d 656. Her husband, Mr. Gates, continued to work for employer.

¶ 3. Employee contends that, after he wrote the 2016 letter in support of Ms. Gates, he experienced a series of negative interactions with certain managers. He points to four negative confrontations with managers at work. His employment record reflects that he received two written disciplinary warnings after the 2016 letter, one in January 2017 for working overtime without permission and a second in May 2017 for wasting company time. After the May 2017 warning, employer took no disciplinary actions against employee until he was fired in July 2019.

¶ 4. In late 2018, employee sustained an injury to his knee. While meeting with his managers related to that injury, employee secretly recorded the conversation. Near the end of the discussion, employer's human resources director, Jessica Fredette, asked whether employee was recording the conversation and employee responded, falsely, that he was not. Fredette told employee that recording conversations at work was not permitted,[1] and employee indicated he was unaware of such a policy.

¶ 5. In early 2019, employee took a medical leave of absence for knee surgery using time allowed under the Family and Medical Leave Act (FMLA) and additional short-term disability benefits offered by employer. His planned return-to-work date was in July 2019.

¶ 6. While he was on leave, the lawsuit filed by Ms. Gates against employer was underway. In May 2019, Ms. Gates's attorney produced the 2018 audio recording employee had

---

[1] The parties dispute whether employer had, at all times relevant here, a no-recording policy. Though this is a genuine dispute, it is not material. Even if employer did not have a policy against recording until after employee's termination, employee could still not sustain his claims for the reasons outlined below.

taken during his meeting about his work-related injury. The attorney also produced other recordings Mr. Gates made in the workplace using a recording device provided by employee.

¶ 7. Later that May and before employee returned to work, Fredette sent employee a letter to discuss both his return to work and "an issue that has arisen in recent weeks involving our discussion about recording conversations." In July, employee met with Fredette and his manager to discuss the issue; employee recorded that conversation as well.

¶ 8. In the July 2019 meeting, employee admitted that he had lied to Fredette when she had asked if he was recording their September 2018 conversation. He said that he gave his recordings to Ms. Gates. He explained that he had "trust issues with . . . management" and he "wanted an unbiased witness." He expressed that he "signed a statement for [Ms. Gates's] worker's [compensation] mediation" and then "right after that [he] started getting [written] up along with [Ms. Gates's] mother and other people that she was friends with." He explained that his trust with management was low because of events that happened "years ago." When Fredette asked what made him start recording in September 2018, he explained that not "all that much thought went into it." He told her that he wanted a "reference," so he could go back and know who said what. He also falsely stated to Fredette that he was not recording this second meeting.

¶ 9. When asked at his deposition why he started to record his workplace conversations, employee explained that he started because he mistrusted management and felt a "recording device would just be an impartial witness." He further explained that he saw Mr. Gates getting written up for "stuff he didn't do," and thought that Mr. Gates was heading towards losing his job. In his own words, employee recorded workplace conversations "for everybody that worked at Mack Molding's benefit."

¶ 10. In July 2019, employee was fired for lying to employer's human resources director about whether he had made electronic recordings of his meetings with management in the workplace.

¶ 11.    Employee filed suit in 2022, alleging breach of contract, promissory estoppel, and violation of the anti-retaliation provisions of the FEPA and the WCA.  The parties filed competing motions for summary judgment.  The court granted summary judgment to employer.  First, it concluded that employee could not sustain a retaliation claim because he was not engaged in protected activity.  Next, it determined that employee could not sustain his breach-of-contract claim arising from statements in the employee handbook because the handbook was clear that employee was employed at-will and could be fired for any reason.  Finally, it held that employee could not sustain his promissory-estoppel claim because employee's termination was not connected to the purported promise to hold a job open for employee after he took short-term disability leave.  Employee appeals.

¶ 12.    On appeal from a grant of summary judgment, we "will apply the same standard as that used by the trial court."  Robertson v. Mylan Lab'ys, Inc., 2004 VT 15, ¶ 15, 176 Vt. 356, 848 A.2d 310.  Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  V.R.C.P. 56(a).  "[W]e give the nonmoving party the benefit of all reasonable doubts and inferences."  Daiello v. Town of Vernon, 2022 VT 32, ¶ 29, 217 Vt. 1, 282 A.3d 894 (quotation omitted).

I.  FEPA and WCA Retaliation Claims

¶ 13.    Employee does not dispute that employer terminated him for lying.  However, he contends that lying in support of a protected activity is itself protected activity.  Assuming arguendo that being fired for lying about a protected activity would make the firing improper, we first consider whether his covert recording of workplace conversations is protected by the FEPA or the WCA.

¶ 14.    The FEPA provides, in relevant part:

> An employer . . . shall not discharge . . . any employee because the
> employee:

4

(A) has opposed any act or practice that is prohibited under this chapter;

(B) has lodged a complaint or has testified, assisted, or participated in any manner with the Attorney General, a State's Attorney, the Department of Labor, or the Human Rights Commission in an investigation of prohibited acts or practices;

(C) is known by the employer to be about to . . . testify, assist, or participate in any manner in an investigation of prohibited acts or practices;

. . . .

(E) is believed by the employer to have acted as described in subdivisions (A) through (D) of this subdivision.

21 VSA § 495(a)(8). The WCA incorporates by reference the provisions against retaliation under the FEPA. 21 V.S.A. § 710(f) ("The provisions against retaliation in subdivision 495(a)(8) of this title and the penalty and enforcement provisions of section 495b of this title shall apply to this section.").

¶ 15. For employee to avoid summary judgment on his retaliation claims, he must establish a prima facie case[2] of retaliatory discrimination by demonstrating "that (1) [he was] engaged in a protected activity, (2) [his] employer was aware of that activity, (3) [he] suffered adverse employment decisions, and (4) there was a causal connection between the protected activity and the adverse employment decision." Hammond, 2023 VT 31, ¶ 38 (quotation omitted).

---

[2] The parties here dispute whether the McDonnell Douglas burden-shifting framework applies. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) (explaining that after employee establishes prima facie case of retaliation, burden shifts to employer to articulate some nondiscriminatory reason for firing, then burden shifts back to employee to show that reason offered is pretextual). Employee contends that he has direct evidence of retaliation, so the burden shifting framework does not apply. See Hum. Rts. Comm'n v. LaBrie, Inc., 164 Vt. 237, 244, 668 A.2d 659, 665 (1995) (concluding there was "no need to apply the McDonnell Douglas framework . . . because plaintiff presented direct evidence of discrimination"); see also Spinette v. Univ. of Vt., 2023 VT 12, ¶ 16, 217 Vt. 550, 292 A.3d 1225 (applying McDonnell Douglas framework in absence of direct evidence of discrimination). We need not decide the issue because we conclude that employee cannot establish, by direct evidence or otherwise, that he was "engaged in a protected activity." Hammond v. Univ. of Vt. Med. Ctr., 2023 VT 31, ¶ 38, __ Vt. __, 308 A.3d 421.

¶ 16.    Employee contends that his activity was protected in two ways.  Employee argues first that his activity of "joining together with other employees to covertly record their conversations with management" is protected.  He next asserts that he was assisting Ms. Gates with her lawsuit against employer when he turned over his September 2018 recording of his meeting with management, and that such assistance is protected.  Because he is entitled to the "benefit of all reasonable doubts and inferences," we accept employee's characterization of his activities for purposes of resolving the motion for summary judgment.  Daiello, 2022 VT 32, ¶ 29 (quotation omitted).

¶ 17.    The trial court concluded that employee's activities were not protected, relying on various federal decisions and a superior court decision.  See Gates v. Mack Molding Co., No. 5:22-cv-100, 2023 WL 4181945 (D. Vt. Mar. 27, 2023) (case brought by Mr. Gates); Gates v. Mack Molding Co., No. 23-CV-02626 (Vt. Super. Ct. Mar. 25, 2024) [https://perma.cc/Q838-PQFU] (same); Argyropoulos v. City of Alton, 539 F.3d 724 (7th Cir. 2008); Spagnolia v. Charter Commc'ns, LLC, No. 21-cv-01787, 2023 WL 3317781 (D. Colo. May 5, 2023).  Because employee's claims call on us to interpret the scope of state law, we consider federal opinions to be persuasive, but not binding, authority.  Payne v. U.S. Airways, Inc., 2009 VT 90, ¶ 10, 186 Vt. 458, 987 A.2d 944.

¶ 18.    Both Gates cases considered only "opposition" clauses, not "participation" clauses,[3] of anti-retaliation provisions within employment statutes.  See Gates, 2023 WL 4181945, at *6 (holding that Mr. Gates's "gather[ing] evidence for [Ms. Gates's] then-pending state lawsuit" is "not FMLA protected activity" under FMLA "opposition" clause making it unlawful for employer to discriminate against employee who opposes practice made unlawful under FMLA); Gates, slip op. at 15 (concluding that "making secret recordings of workplace conversations with

_____

        [3]   Employee characterizes 21 V.S.A. § 495(a)(8)(A) as the "opposition" clause and § 495(a)(8)(C) as the "participation" clause.  For the sake of clarity, we adopt this shorthand here.
                                          6

one's supervisors or co-workers does not constitute protected oppositional activity" under the FEPA and the WCA). Spagnolia similarly analyzed an employee's claims under the state law prohibiting retaliation against an employee who "has opposed" any unlawful employment practice. 2023 WL 3317781, at *13. Employee contends the logic of these cases should not govern because the cases discussed only anti-retaliation clauses governing "opposition" rather than "participation."

¶ 19. Our objective in interpreting statutes is "to determine and give effect to the intent of the Legislature." Delta Psi Fraternity v. City of Burlington, 2008 VT 129, ¶ 7, 185 Vt. 129, 969 A.2d 54 (quotation omitted). Where legislative intent is apparent on the face of the statute, it "must be enforced according to its terms without resort to statutory construction." In re Estate of Cote, 2004 VT 17, ¶ 10, 176 Vt. 293, 848 A.2d 264. When the plain language is ambiguous, however, we construe statutes in light of the "entire statutory scheme." Holmberg v. Brent, 161 Vt. 153, 155, 636 A.2d 333, 335 (1993). When faced with an ambiguous statute, we "must examine and consider fairly, not just isolated sentences or phrases, but the whole and every part of the statute." Brown v. W.T. Martin Plumbing & Heating, Inc., 2013 VT 38, ¶ 20, 194 Vt. 12, 72 A.3d 346 (quotation omitted).

¶ 20. The FEPA's participation clause protects an employee who "is known by the employer to be about to lodge a complaint, testify, assist, or participate in any manner in an investigation of prohibited acts or practices" from retaliation. 21 V.S.A. § 495(a)(8)(C). "Investigation" is not defined in the statute. See id. § 495d (providing definitions for subchapter). Employee points us to a dictionary definition of the word "investigation" and argues that employee's actions fall into it. Employer instead argues that "investigation" means an investigation by the "Attorney General, a State's Attorney, the Department of Labor, or the Human Rights Commission," as specified in § 495(a)(8)(B).

7

¶ 21. Given the plausibility of both parties' arguments, we conclude that the participation clause is ambiguous. See Cote, 2004 VT 17, ¶ 10 (explaining that when "both parties' interpretations are plausible," statute is ambiguous). Accordingly, we construe the participation clause in light of the "entire statutory scheme." Holmberg, 161 Vt. at 155, 636 A.2d at 335.

¶ 22. Employee argues that "investigation" in subdivision (c) could include private civil litigation, not just matters before government agencies. He contends that the absence of reference to the specified government entities listed in subdivision (b) in subdivision (c) means that the exclusion was intentional. Employer argues that, read in context, the FEPA's participation clause in subdivision (c) refers to the sort of investigation described in subdivision (b).

¶ 23. We think employer's interpretation is correct. Employee's proposed construction of the statute would prohibit retaliation against an employee who is "about to" participate in a broad variety of investigations but would not offer protection for an employee who has actually participated in those investigations. In construing statutes, we must "avoid results that are irrational or unreasonable." In re S.B.L., 150 Vt. 294, 301, 553 A.2d 1078, 1083 (1988). Employee's proposed interpretation of the statute leads to irrational results.

¶ 24. We instead conclude that the Legislature intended the "investigation" referred to in subdivision (c) to mean the sort of investigation it defines immediately beforehand. Read in this light, the FEPA prohibits an employer from discriminating against an employee for (a) opposing a prohibited practice; (b) complaining, testifying, assisting, or participating in a government investigation of a prohibited practice; (c) being known by the employer to be "about to" take an action described in subdivision (b); (d) disclosing or discussing wages; or (e) being "believed by the employer" to have taken an action described in subdivisions (a) through (d).

¶ 25. Because employee does not contend that his actions, whether taken on behalf of all employees or for Ms. Gates's benefit, were in any way related to a government investigation as described in subdivision (b), his covert recording does not fall within the scope of the FEPA's

8

participation clause. Employee also does not contend that employer knew that he was "about to" participate in any government investigation, as is necessary to sustain a claim under subdivision (c).

¶ 26. Nor do employee's actions fall within the scope of the WCA's protections against retaliation. The WCA provides that:

> An employer shall not retaliate or take any other negative action against an individual because the employer knows or suspects that the individual has . . . reported a violation of this chapter, or has testified, assisted, or cooperated in any manner with the Department [of Labor] or other appropriate governmental agency or department in an investigation of misclassification, discrimination, or other violation of this chapter.

21 V.S.A. § 710(d). This language is similarly cabined; only participation in an investigation by "the Department or other appropriate governmental agency or department" qualifies for protection under the WCA's anti-retaliation provision. We accordingly see no basis for disturbing the trial court's grant of summary judgment to employer on the retaliatory discharge claims.

¶ 27. Because we conclude that covertly recording workplace conversations under the facts presented here is not protected, we need not reach employee's contention that lying in support of a protected activity is itself protected under the FEPA or the WCA. Similarly, because we conclude that employee's recording activities were not protected under state law, we affirm the trial court's denial of employee's request for judgment as a matter of law that he was unlawfully terminated for engaging in protected conduct.

¶ 28. Employee cites a line of decisions from the National Labor Relations Board (NLRB) concluding that employees acting in concert to procure secret recordings of management are "protected by Section 7 of the [National Labor Relations Act (NLRA)]." Starbucks Corp., 372 NLRB No. 50 at 6 (2023). Even so, making such recordings outside of the scope of an "investigation" does not entitle the employee to FEPA protections. The FEPA prohibits an employer from discriminating against an employee who "is known by the employer to be about to

9

lodge a complaint, testify, assist, or participate in any manner in an <u>investigation</u> of prohibited acts or practices." 21 V.S.A. § 495(a)(8)(C) (emphasis added). An employee who believes his rights to record under the NLRA are being infringed may avail himself of the NLRB's exclusive jurisdiction over claims for violations of the NLRA. See <u>San Diego Bldg. Trades Council v. Garmon</u>, 359 U.S. 236, 242 (1959) ("When an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the [NLRB] if the danger of state interference with national policy is to be averted.").

¶ 29. Employee argues that though his "protected status arises in part under NLRA," he is nevertheless entitled to "prosecute state law retaliation claims" based on that "protected activity." Employee misstates our law. The FEPA prevents employers from taking certain enumerated actions. See, e.g., 21 V.S.A. § 495(a)(1) (stating that employer may not discriminate between employees on specified grounds); <u>id</u>. § 495(a)(2) (stating that employer must not advertise for employment indicating preferences for certain categories of prospective employees); <u>id</u>. § 495(a)(7)(B) (stating that employer must not prohibit employees from discussing wages). The relevant "protected activity" for a participation clause claim is that an employee is "about to lodge a complaint, testify, assist, or participate in any manner" in an investigation, as described above. See <u>id</u>. § 495(a)(8)(C). The FEPA's participation clause is not a free-floating law prohibiting retaliation for any employee action that might be protected by other statutes.

## II. Breach of Contract

¶ 30. Employee contends that employer breached a contract with him, created by the employee handbook.[4] He argues that the handbook provided certain protections to employees and that those protections were breached when he was terminated. The trial court concluded that the

---

[4] The appellate record contains several different versions of the employee handbook over time. For purposes of his breach-of-contract claim, employee appears to adopt the July 2016 handbook as the operative document. We limit our review to that version of the handbook.

various representations in the handbook "made clear that [employee's] at-will employment could be terminated 'at any time and for any reason with or without cause or notice,' and that conduct violations could provide the basis for termination of employment without any forms of prior corrective action." The court accordingly granted summary judgment to employer on employee's claim of breach of contract.

¶ 31.    Employee contends that various statements in the employee handbook[5] "give rise to a reasonable expectation on the part of employees that, in the absence of serious misconduct, they will not be terminated without fair warning." The employee handbook prohibits retaliation, provides information about the short-term medical-absence benefit, and includes a "Constructive Action Process" providing for progressive discipline. He argues that "when the terms of [an employee handbook] are ambiguous" and could support a finding that there is an employment contract, the question of whether an employee is at-will should be submitted to the jury, defeating summary judgment. Dillon v. Champion Jogbra, Inc., 175 Vt. 1, ¶ 11, 819 A.2d 703, 707 (2002) (alteration omitted).

¶ 32.    "The question of whether a written manual is ambiguous is a determination of law that we review de novo." Id. ¶ 14, 819 A.2d at 708. The handbook makes the following representations. In large text in the introductory section, the handbook states: "AT WILL

---

[5]    Although employee relies on the protections listed in the handbook to argue his employment was not at-will and summary judgment was improper, he also repeatedly points to the handbook's relative unavailability. He contends that the handbook was not distributed to employees and was only available to employees either in the human resources office or on a computer in a disused bathroom, where it was frequently broken and unavailable. In any event, he does not explain how the availability of the handbook concerns his claims. Employee effectively asks "us to comb through . . . the record to locate his arguments and divine how the civil division erred as a result." Kelly v. Univ. of Vt. Med. Ctr., 2022 VT 26, ¶ 30, 216 Vt. 445, 280 A.3d 366. We decline to consider this inadequately briefed argument. Id.; see Johnson v. Johnson, 158 Vt. 160, 164 n.*, 605 A.2d 857, 859 n.* (1992) (stating that Court will not address "contentions. . . . so inadequately briefed as to fail to meet the standard of V.R.A.P. 28(a)(4)"); V.R.A.P. 28(a)(4) (providing that appellant's brief should explain what issues are presented, how they were preserved, and what appellant's contentions are on appeal, with citations to authorities, statutes, and parts of record relied on).

DISCLAIMER: This Handbook does not constitute a contract between the Company and an employee, and this Handbook places no contractual obligations on Mack Molding Company or its employees." It explains that the employment relationship is "at will," and that the employer can terminate "employment at any time and for any reason with or without cause or notice." It explains that no verbal promises made by agents of the employer "are enforceable unless reduced to writing and signed by the President" of employer.

¶ 33.    As employee notes, the handbook states that "retaliation . . . for cooperating in an investigation of a complaint of . . . harassment[] is unlawful." It also provides that employer's short-term disability program "is available to all full-time hourly paid employees." The handbook also provides for a disciplinary process for employees. Within the disciplinary process section, the handbook expressly provides that employees "should not assume that any or all of the steps outlined below will be followed in every situation" and that the stated "process does not create a binding obligation to follow these steps in every situation."

¶ 34.    The situation created by the handbook here is not like that of Dillon, where despite an "at will" disclaimer, the disciplinary policy "require[d] management" to follow certain steps in the process. Dillon, 175 Vt. 1, ¶ 15, 819 A.2d at 708. In that situation, we concluded that the handbook was "at the very least ambiguous regarding employees' status." Id. 1, ¶ 17, 819 A.2d at 709. Rather, the handbook at issue is much more like the handbook in Ross v. Times Mirror, Inc., 164 Vt. 13, 21, 665 A.2d 580, 584 (1995). In Ross, we concluded that handbook's list of reasons for discipline was not a "promise for . . . specific treatment in a specific situation" because the handbook stated that "the Company expressly reserves the right to terminate the employment relationship at will" and "conduct such as, but not limited to, the examples" provided would be causes for disciplinary action. Id. Here, employee's employment relationship was at-will and the handbook did not make any promises modifying that status. The trial court did not err in granting summary judgment to employer on employee's breach of contract claim.

### III. Promissory Estoppel

¶ 35.   Employee was on short-term disability leave at the time of his termination. Because employer fired him before his return to work, employee contends that employer breached an obligation created by its promise to allow him to return to work after his leave. The trial court concluded that there was no causal connection between the termination and employee's medical leave, so employer was entitled to summary judgment on employee's promissory-estoppel claim.

¶ 36.   "[P]romissory estoppel may modify an at-will employment relationship and provide a remedy for wrongful discharge." Foote v. Simmonds Precision Prods. Co., 158 Vt. 566, 571, 613 A.2d 1277, 1280 (1992). To sustain a promissory estoppel claim, employee must "[1] demonstrate that the termination was in breach of a specific promise made by the employer, [2] that the employer should have reasonably expected to induce detrimental reliance on the part of the employee, and [3] that the employee did in fact detrimentally rely on the promise." Dillon, 175 Vt. 1, ¶ 19, 819 A.2d at 709.

¶ 37.   Employee argues that he "had a legitimate expectation that he would be permitted to return to work" after his period of short-term disability because of statements employer made. Fredette, the human resources director for employer, sent employee a letter explaining his disability benefits, providing: "[i]f you . . . recover after you have used 12 weeks of FMLA but before the maximum benefit (time away from work) of twenty-six (26) weeks is exhausted, you will still be considered" an employee and will "be reinstated to the first available position for which you are qualified." However, the handbook provided that no "representations made by Company employees or agents are enforceable unless reduced to writing and signed by" the president of employer.

¶ 38.   Employee is entitled to the "benefit of all reasonable doubts and inferences." Daiello, 2022 VT 32, ¶ 29 (quotation omitted). Even if we ignored the handbook and viewed the statement by Fredette as a promise, employee's termination was not "in breach of a specific

promise made by the employer." Dillon, 175 Vt. 1, ¶ 19, 819 A.2d at 709. Employee was merely promised that he would be able to return to "the first available position" for which he was qualified upon return from his disability leave. Employee does not offer any evidence to suggest that the promise to retain his employment while he was on disability leave included a promise to refrain from terminating his employment for any other reasons. See Woolaver v. State, 2003 VT 71, ¶ 31, 175 Vt. 397, 833 A.2d 849 (explaining that promise to extend employee's probationary period did not include "an absolute guarantee" that she would "not be fired for any reason," defeating her promissory estoppel claim). Employee agreed he was terminated for lying about his recording activity. With no connection between the termination and the promise, employee cannot sustain his promissory-estoppel claim. Taylor v. Nat'l Life Ins. Co., 161 Vt. 457, 472, 652 A.2d 466, 475 (1993) (concluding that employee could not establish promissory estoppel because "[t]he elimination of the job . . . was an independent event unconnected to the promise").

Affirmed.

FOR THE COURT:

_____

Associate Justice

14